## Westville Coal Company v. Daniel Schwartz.

1. FELLOW-SERVANTS—*The Relation Held Not to Exist Under the Circumstances of a Particular Case.*—In a suit by a miner against a coal company for injuries alleged to have been caused by negligence, the court reviews the evidence and holds that a mine inspector, manager and pit boss, stood in his relation to the plaintiff not as a fellow-servant, but as a master or vice principal.

2. NEGLIGENCE—*A Plaintiff Held to Have Exercised Ordinary Care.* —In a suit by a miner against a coal company for injuries alleged to have been caused by negligence the court reviews the evidence and holds that the plaintiff, in obeying the commands of a mine manager, inspector and pit boss, acted with that degree of prudence that an ordinarily prudent man would have exercised under like circumstances.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Vermilion County; the Hon. FERDINAND BOOKWALTER, Judge,

presiding. Heard in this court at the November term, 1897. Affirmed. Opinion filed June 3, 1898.

W. J. CALHOUN and H. M. STEELY, attorneys for appellant.

WILL BECKWITH and F. E. SHOPP, attorneys for appellee.

MR. JUSTICE GLENN DELIVERED THE OPINION OF THE COURT.

This is an action on the case, brought by appellee to recover damages for injuries received while operating an electric machine in mining coal for appellant, by the falling of a large piece of soapstone or slate from the roof of the mine over his head. The injuries were received on the night of December 21, 1896, and were quite severe, resulting in the permanent loss of the sense of hearing in one of his ears. The malar bone on the right side was fractured, the fracture extending to the front and through the superior or maxillary bone, or upper jaw bone, between the first and second teeth on the right hand side. It also extended toward the back in the region of the ear. The malar bone is pressed down from the upper part, and prevents appellee from closing his mouth, and he is not able to eat solid food. This injury is permanent. He received other injuries that were not permanent, but from which he suffered great pain and inconvenience.

The circumstances surrounding appellee at the time he sustained the injuries complained of were, as appears from the evidence, substantially as follows: He was in the employ of appellant as the runner of an electric machine used in mining coal. The custom in this mine was to have a runner and a helper for each machine. Appellant at the time of the injury to appellee was operating a coal mine of some two hundred rooms with seven machines, which were operated day and night. The motive power to run these machines was by electricity. This mine was a machine mine. In a mine of this kind miners are not assigned to any special room. They are shifted from room to room by the bosses, not working in any one more than two or three

hours at any one time, and sometimes working in a room they have not seen for several weeks. Succinctly stated the method of mining coal with a machine is as follows: The rock gang, consisting of two miners, would first go into the room, clean out the debris, pull down the loose and overhanging rock from the roof, sound the roof and prepare the room for the machine men. Then the machines would be brought into the room. The machine moves along the face of the coal and is set along-side where it cuts as before, and so on until it cuts clear across the room. The machine men have nothing to do with the bringing down or loading of the coal. After they get through cutting in a room, the machine men load up their machine and take it into whatever room the night or day pit boss, who is in charge of that part of the mine, directed. Every machine runner and helper had a machine assigned exclusively to them, and followed it in its rounds. The usual custom in appellant's mine, after a machine was hauled into a mine, was for the machine runner and helper to unload and oil it, change the bits and fix it in proper position to operate.

On the night of the unfortunate disaster to appellee, an arrangement was made to make a record greater in the ten hours shift than had been made at a neighboring mine—the Kellyville mine. The best record that had been made at the Kellyville mine at that time was seventy-four runs in the shift of ten hours. The best record in the Westville—appellant's mine—was fifty-nine runs in the shift of ten hours, and it was customary to make from twenty-five to thirty runs in the ten hours shift in appellant's mine. Schwartz, the appellee, had made fifty runs in the shift of ten hours.

The two miners selected to run the machine to make this record for the Westville Coal Company were Tommy Fitzpatrick and Daniel Schwartz, appellee herein. They were selected by Rhodes, the mine inspector, the mine manager and the night pit boss of appellant. He was licensed as such at that time.

Fitzpatrick and Schwartz were two of the best miners in

appellant's employ. These two men were to work together this night on two machines, first on one and then on the other. One of the machines was Schwartz's and the other Fitzpatrick's. Appellee met Fitzpatrick and Rhodes, the mine manager and night pit boss, at the bottom of the shaft. He took them to one side and asked them to beat the Kellyville record. Schwartz said, " I will not do it for no two dollars." Rhodes said, " We do not ask you to do it for no two dollars." Then Tommy Fitzpatrick spoke up and said, " The cigars ought to be in it anyway." Rhodes replied saying, " Yes, the cigars will be in it whether you beat or not." This conversation occurred a few minutes before seven o'clock P. M. At that hour, under the direction of Rhodes, the mine manager and night pit boss, appellee and Fitzpatrick went into a small room that opened off of the second north entry and made eight runs with machine No. 4. Then by orders from Rhodes they went to room No. 10, leaving machine No. 4 in the room where they had just made the eight runs. They found the machine No. 1 already put up and in working order for them in room No. 10. As they were entering room No. 10 the night boss, Rhodes, was coming out. Appellee said to him, " Jeff, is this place safe and all right ? " He replied, " Yes, it is all right; go ahead, and go to running; you and Fitzpatrick need not look after the unloading of the machines, setting of the bits, nor the roof; you are to beat the Kellyville record." Appellee further said, " Rhodes, this is a big wide place in there, is it safe and all right ? " He replied, " Yes, it is safe and all right; go ahead."

John Williams, a mine inspector, mine manager, and day pit boss for appellant, examined room No. 10, in which appellee was injured, about five o'clock of that evening, and found indications of coal slips in the roof. He says when there is danger of coal slips it is the most dangerous roof of all. He says it was his custom and duty to examine the roofs of the different rooms and if he found a room unsafe to mark the place and call the men to take it down. But on this evening he was in a hurry and did not do it. The stone gang, Dettman and Leonard, were in room No. 10 two

or three times that night and did some work under Rhodes, but did not sound the roof.   About ten o'clock of this evening Rhodes and Dzums relieved Fitzpatrick and appellee and ran the machine while they ate their lunch.   Upon resuming their work and while making their thirtieth run, and with their undivided attention given to the running of the machine, and while appellee was oiling the machine, a rock weighing from 500 to 1000 pounds fell from the roof, crushing his face in the machine, and inflicting the injuries complained of, upon him.

The appellee grounds his right of recovery upon the fact that he and Fitzpatrick with their two machines were ordered by Rhodes, the mine inspector, mine manager, and night boss, on the night appellee was injured, in the ten hours shift to make a record that would beat the record of the Kellyville mine.   As they entered room No. 10 he assured them it was safe and for them to go ahead, and promised them that all they need do was to run and oil their machines; that the loading of the machines, the setting of the bits and the sounding of the roof would be looked after; that they were to beat the Kellyville mine record; that Rhodes knew or might have known the roof of room No. 10 was not safe, but this fact was not known to appellee, nor did he know that Rhodes did not sound the roof, as was customary, or as he had impliedly promised to do, but appellee, relying on the assurances of safety made by Rhodes and his promises to look after the roof, gave his constant and undivided attention and best exertions to make a greater number of runs, in this ten hours shift, than had been made at the Kellyville mine, and while thus engaged, and not knowing the roof was not safe, he was injured.

That appellee and Fitzpatrick were ordered to beat the record of the Kellyville mine on the night in question appears from the evidence.   It is true Rhodes contradicts appellee in all that took place at bottom of the shaft, where he came to go to work and where Fitzpatrick was present, except he admits appellee asked him what would be in it.   Fitzpatrick in testifying about this same conversation says

Schwartz asked Rhodes what was in it and he said there was two dollars in it. " When Schwartz said there ought to be something in it, I said there ought to be the cigars in it anyway, and Rhodes said there would be cigars. I did not ask anything about the Kellyville record. I can not say what brought up the conversation. * * * Rhodes did say something to me about the record. I did not ask him what record. I had an idea of my own." These scraps of conversation shed but very little light upon the question in issue unless they have reference to an effort that was to be made to beat the Kellyville mine record. When it is considered that two of the best machine runners in the mine are put on machines Nos. 1 and 4 to run them alternately, that they were relieved from loading and unloading them, and the bits were to be changed for them and the machines to be set up for operation, it is convincing, that, on this unfortunate night for appellee, there was to be an effort made to beat the record of the Kellyville mine. The fact that these two men had made thirty runs in three hours, the customary runs for a shift of ten hours, and the fact that Rhodes and Dzums ran the machine while Fitzpatrick and appellee ate their lunch, are circumstances tending to establish the same fact. When the facts and circumstances occurring this evening prior to appellee's injury are viewed in the light that there was an effort being made to beat the record of the Kellyville mine, they corroborate appellee in his statement and theory of his case. The day boss testified that he examined the roof in room No. 10 about five o'clock that evening and there were indications of coal-slips, and that the roof was not safe. Rhodes was in the room several times that evening after Williams had been there, and if he did not know, might have known, the roof was not safe. He was in room No. 10 several times this evening before appellee was injured, and it does not appear that he examined, or had any one else examine, the roof. The rock gang were in this room two or three times that evening and it does not appear that he had them sound the roof. Appellee was in room No. 10 but once or twice

before this evening. We think the proximate cause of appellee's injuries was the assurance of Rhodes that the mine in room No. 10 was safe, when in fact it was not, and in promising to look after the roof of the room and neglecting to do it. It was his duty to furnish appellee with a reasonably safe place to work and this he failed and neglected to do.

The court holds that appellee, in obeying the commands of Rhodes, acted with that degree of prudence that an ordinarily prudent man would have done under like circumstances Rhodes, as mine inspector, mine manager and night pit boss, stood in his relation to appellee as master or vice principal. They were not fellow-servants. Chicago Anderson Pressed Brick Co. v. Sobkowiak, 148 Ill. 573; Consolidated Coal Co. v. Wombacher, 134 Ill. 57; Union Pac. Ry. Co. v. Jarvi, 53 Fed. Rep. 65; Western C. & M. Co. v. Ingraham, 70 Fed. Rep. 219.

We have examined the instructions given by the court on behalf of appellee, and those given, modified and refused by the court on behalf of appellant, and are unable to find that they contain any prejudicial error. There was a sharp conflict in the evidence in this case on the material issues. Appellee is contradicted by Fitzpatrick and Rhodes, but not by Dzums and Ramsay. Appellee is, however, corroborated by the facts and circumstances in proof, and in some particulars by Fitzpatrick. In cases of this kind it is the province and duty of the jury to determine with which side the greater weight of evidence is, and having determined it was with appellee, we are not disposed to disturb their finding, and the judgment of the Circuit Court will be affirmed.